

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 08  CV  1956

THE DOE RUN RESOURCES CORPORATION  d/b/a THE
DOE RUN COMPANY,

08 - cv - _____

                              Plaintiff,

**COMPLAINT**

              -against-

BHL RESOURCES LIMITED INC., and John Does 1-5,

                              Defendants.



The plaintiff, The Doe Run Resources Corporation d/b/a/ The Doe Run Company

("Doe Run"), by and through its undersigned counsel, herein states its cause of action and claim

for relief against the defendant, BHL Resources Limited Inc. ("BHL") as follows:

### PARTIES

1.     Doe Run is a New York corporation with its principal place of business in

St. Louis, Missouri.

2.     Doe Run is in the business of, among other things, mining, refining and

selling zinc concentrates.

3.     BHL is a foreign business entity with its principal place of business in

Panama.

4.     BHL is in the business of, among other things, purchasing and trading zinc

concentrates.

5.     John Does 1-5 are persons or business entities who may be vicariously

liable to Doe Run by virtue of having acted as agents and/or alter egos of BHL, or who may be

independently liable to Doe Run for their purposeful interference with BHL's contractual relations with Doe Run.

## JURISDICTION AND VENUE

6.    Jurisdiction is proper in this district under 28 U.S.C. § 1332(a)(2) because the plaintiff is a citizen of the State of New York, the defendant is a citizen of the Republic of Panama, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    Venue is proper in this district under 28 U.S.C. § 1391(a)(3) because the defendant is a resident of the Republic of Panama, it has consented to the personal jurisdiction of this district's courts, and there is no district in which this action may otherwise be brought.

## GENERAL ALLEGATIONS

8.    Doe Run and BHL (together, the "Parties") are parties to Contract No. DR-ZNC-11407/BHL P2119 (the "Contract"), a true and correct copy of which is attached hereto as Exhibit "A" and incorporated herein by this reference.

9.    Pursuant to the Contract, Doe Run agreed "to sell and deliver" to BHL, and BHL agreed "to purchase, accept and pay for," 40,000 dry metric tons of zinc concentrates.

10.    The Contract further provided that performance would be due in four 10,000 ton "parcels" of concentrates, with Doe Run shipping such parcels to BHL in:

(a)    June / July, 2007 (the "July 2007 Delivery");

(b)    November / December, 2007 (the "December 2007 Delivery");

(c)    June / July, 2008 (the "July 2008 Delivery"); and

(d)    November / December, 2008 (the "December 2008 Delivery").

11.     With respect to the July 2007 Delivery, the Parties substantially performed the Contract: Doe Run "sold and delivered" to BHL, and BHL "purchased, accepted and paid" Doe Run for, 10,000 tons of zinc concentrates.

12.     Pursuant to certain "true-up" provisions of the Contract, Doe Run is currently obligated to BHL for $182,446.06 with respect to the July 2007 Delivery.

13.     With respect to the December 2007 Delivery, Doe Run was ready willing and able to sell and deliver 10,000 tons of zinc concentrates to BHL.  Indeed, Doe Run loaded and shipped the contents of the December 2007 Delivery to New Orleans, LA, the port of embarkation under the Contract.  BHL, however, refused to purchase, take delivery or pay for that parcel of 10,000 tons of concentrates.

14.     Doe Run subsequently sold the December 2007 Delivery to a third party on the spot market for $3,059,000 less than it would have been paid by BHL under the Contract.

15.     Doe Run is ready, willing and able to make the July 2008 Delivery and the December 2008 Delivery.  BHL, however, has indicated that it will also refuse to purchase, take delivery or pay for those two deliveries.

16.     Despite having had the opportunity to do so, Sr. Alan Baron, a principal of BHL Peru ("BHLP"), an affiliate of BHL, has offered Doe Run no credible excuse for BHL's failure to perform.

### FIRST CAUSE OF ACTION
(Breach of Contract)

17.     Doe Run repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

18.    The Contract is a valid and enforceable contract between the Parties.

19.    Doe Run has substantially performed its obligations under the Contract to date and is ready, willing and able to substantially perform its remaining obligations under the Contract.

20.    BHL failed to perform the Contract with respect to the December 2007 Delivery.

21.    BHL's failure to perform the Contract with respect to the December 2007 Delivery constitutes a material breach of the Contract.

22.    BHL's material breach of the Contract has damaged Doe Run in the amount of $3,059,000 with respect to the December 2007 Delivery.

23.    BHL has anticipatorily breached its obligations under the Contract with respect to the July 2008 Delivery and the December 2008 Delivery.

24.    BHL's material breach of the Contract has further damaged Doe Run in the approximate amount of $6,118,000 with respect to the July 2008 Delivery and the December 2008 Delivery.

## PRAYER FOR RELIEF

**WHEREFORE**, The Doe Run Resources Corporation demands judgment against BHL Resources Limited Inc. as follows:

(i)    A judgment against BHL that BHL has breached the Contract and an award to Doe Run of damages for that breach, in regards to the December 2007 Delivery, in the amount of $3,059,000, plus interest, less the $ 182,446.06 that Doe Run owes BHL in regards the July 2007 Delivery;

(ii)    A judgment against BHL that BHL has breached the Contract and an award to Doe Run of damages for that breach, in regards to the July 2008 Delivery and the December 2008 Delivery, in the approximate amount of $6,118,000 to be determined with precision by this Court at trial;

(iii)    An award to Doe Run of its litigation costs and attorneys fees as provided by Section 15.2 of the Contract; and

(iv)    For such other and further relief as this Court deems just and proper.

**Dated:**    New York, New York
        February 27, 2008

CADWALADER, WICKERSHAM & TAFT LLP

By:        Joshua R. Weiss (JW 9959)

One World Financial Center
New York, New York 10281
212.504.6225 (t)
212.504.6666 (f)
jweiss@cwt.com


- and -


J. Thomas Beckett (JB 9795)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
801.532.1234 (t)
801.536.6111 (f)
tbeckett@parsonsbehle.com


*Attorneys for Plaintiff The Doe Run Resources Corporation*

5

## ZINC CONCENTRATE SALE AND PURCHASE CONTRACT

**CONTRACT NO.:** DR-ZNC-11407/BHL P2119          **DATE:** November 14, 2006

This Concentrate Sale and Purchase Contract (this **"Contract"**), effective as of November 14th, 2006 (the **"Effective Date"**), is made by and between:

**The Doe Run Resources Corporation**, a New York corporation with offices at 1801 Park 270 Drive Suite 300, St. Louis, MO 63146 (herein, the **"Seller"**), and

**BHL Resources Limited Inc.,** a Panama corporation with offices at Edificio The Century Tower, Piso 16, Oficina 1621, Via Ricardo J. Alfaro, Apartado 87-4094, zona 7 Panama, (herein, the **"Buyer"**).

FOR AND IN CONSIDERATION of the promises and the mutual covenants and agreements contained herein, Seller and Buyer hereby agree as follows:

1.    **DEFINITIONS.**

Capitalized terms (singular includes the plural and vice versa) not otherwise defined and as used in this Contract or in any other associated document shall have the following meanings assigned to them:

1.1    **"Business Day"** shall mean any day other than Saturday, Sunday or a day that is a bank or public holiday in the State of Missouri, United States of America.

1.2    **"Date of Arrival"** shall mean the date on which a particular Lot of Concentrate arrives at the final destination port.

1.3    **"US Dollars or $"** shall mean the currency of the United States of America.

1.4    **"LME"** means the London Metal Exchange.

1.5    **"Units of Measurement."**  For the purposes of this Contract, references to the following weights and measures shall mean:

|     |                  |   |                                          |
|-----|------------------|---|------------------------------------------|
| (a) | MT or Metric Tonne | = | 2,204.62 pounds (avoirdupois)          |
| (b) | DMT              | = | dry metric tonne                         |
| (c) | WMT              | = | wet metric tonne                         |
| (d) | unit             | = | a hundredth part of a dry metric tonne   |
| (e) | ounce            | = | a troy ounce of 31.1035 grams            |
| (f) | pound            | = | sixteen ounces (avoirdupois)             |

Missouri Zinc Concentrates                                            Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.                        BHL–P2119

2.    **SALE AND PURCHASE.**

Upon the terms and conditions in this Contract, the Seller agrees to sell and deliver to the Buyer and the Buyer agrees to purchase, accept and pay for the Missouri Zinc Concentrate described herein (the "**Concentrate**").

3.    **QUANTITY**.

A total of forty thousand (40,000) DMT plus or minus five percent of Missouri grade zinc concentrate for the period of this agreement.  Twenty thousand (20,000) DMT +/-5% shall be delivered in calendar year 2007 and twenty thousand (20,000) DMT +/-5% shall be delivered in calendar year 2008.

4.    **QUALITY.**

4.1    The typical specifications for the Concentrate to be sold under this Contract are approximately as follows:

| | | | | | |
|------|-------------|------|-------------|------|------------|
| Zn | 55 – 60    % | Fe | 1.5 – 4    % | Pb | 2.0 – 4.5 % |
| Cd | 0.60 – 0.90 % | Cu | 0.25-0.35 % | Co | 0.04-0.08% |
| Ni | 0.03-0.08   % | Mg | 0.40-0.70 % | S | 29 –33   % |
| As | 0.005-0.010% | Ge | 0.003-0.006% | Bi | <0.01   % |
| Ag | 9 – 12 t.o./st | SiO$_2$ | 0.60–0.90 % | | |

4.2    No Other Deleterious Impurities.  The Concentrate shall be otherwise materially free from deleterious impurities and elements that would have a significant deleterious adverse effect on general smelting and refining operations.

4.3    Moisture.  Moisture content of the Concentrate upon delivery to ocean vessel shall be sufficient to avoid harmful blowing and dusting and shall conform to the regulations of IMO Code of Safe Practice for solid bulk cargoes.  Seller to promptly present valid TML, FMP and moisture certificates if so requested by Buyer for each individual cargo.

4.4    Replacement.  If any Lot of Concentrate does not meet in any adverse material respect the typical specifications set forth above, Buyer shall as soon as practicable within thirty (30) days following date of arrival at the named destination port (unless non-conformity couldn't have been reasonably established during this period of time), notify Seller of the details of such non-conformity and Seller and Buyer shall then negotiate in good faith an appropriate remedy to overcome any significant financial disadvantages or technical difficulties that the Buyer or the Receiving works have suffered or may suffer as a result thereof; provided that any such remedy shall not involve termination of or any change in the duration of this Contract unless such technical disadvantage results in the Concentrate being impossible to treat at the Buyer's designated receiving works.  If Buyer and Seller do not reach an agreement on an appropriate

2

Missouri Zinc Concentrates                                    Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.          BHL–P2119

(4.4  Replacement continued).

remedy with respect to any non-conforming Lot within fifteen (15) days following notice of non-conformity, Buyer may delete such Lot from the annual quantity for that year by notice given promptly after such forty five (45) day period and Seller shall bear any costs for removal and shipment of such Lot to an alternate destination for Seller's account.   Upon such notice of deletion, Seller shall promptly reimburse Buyer for any provisional payment made by Buyer to Seller with respect to such deleted Lot and Seller shall replace the non-conforming material with conforming material as soon as practical. In the interim, Buyer shall store and maintain any such non-conforming Lot in a reasonable manner so as to ensure such Lot does not become commingled or contaminated with other materials, foreign debris, or otherwise at risk of loss, deterioration or destruction during the period of any such negotiation and until return to Seller or Seller's agent. Each shipment shall constitute a separate delivery and sale. Seller will have the right to replace material per above.

4.5   Disclaimer.   BUYER   AGREES   THAT   SELLER   MAKES   NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, WITH RESPECT TO THE CONCENTRATE SOLD PURSUANT TO THIS CONTRACT, INCLUDING WITHOUT LIMITATION AND SPECIFICALLY NEGATING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTERS, OTHER THAN THE EXPRESS WARRANTIES SET OUT IN THIS AGREEMENT. NO REPRESENTATION OR STATEMENT MADE BY THE SELLER OR ITS AGENTS, EMPLOYEES, REPRESENTATIVES OR ANY OTHER PERSON ON ITS BEHALF NOT EXPRESSLY CONTAINED IN THIS AGREEMENT SHALL BE BINDING UPON SELLER AS A REPRESENTATION OR WARRANTY OR OTHERWISE.

5.    **DELIVERY.**

5.1    Schedule.  The Concentrate shall be shipped in parcels of 10,000 +/-5% DMT lots in June/July 2007, November/December 2007, June/July 2008, and November/December 2008 unless otherwise agreed in writing between Buyer and Seller. Buyer will be responsible for any delay in the shipping schedule for any material subject to a Holding Certificate (Attachment A) issued to Buyer or Buyer's bank and not authorized to be timely delivered for the shipment by Buyer or Buyer's bank against tender to Seller of the Holding Certificate.

5.2    Delivery Terms.  The Concentrate shall be delivered INCOTERMS 2000 CIF named Main Chinese, Main Japanese, or Main Korean port, in Buyer's option, to be declared for each parcel. Deliveries to other locations to be excluded unless approved by Seller. Maximum ocean freight cost allowed by Seller from New Orleans to final destination is USD $65.00 per WMT.  Any excess ocean freight cost shall be for the Buyer's account.

5.3    Optional Delivery.  Seller and Buyer may agree to deliver the Concentrates FOB (Ship's Rail) New Orleans. Cost to stow and trim shall be for Seller's account. Ocean shipment shall be in a vessel nominated by the Buyer and suitable for such ocean shipment. Loading rate at New Orleans (Burnside) shall be a minimum or 4,000 (four thousand) WMT PWWD SHEX UU

Missouri Zinc Concentrates                                      Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.                BHL–P2119

(5.3    Optional Delivery continued).

unless otherwise agreed in writing between Buyer and Seller. Actual time used during excluded periods shall count as laytime. Seller shall provide notice at least 15 days prior that the cargo shall be ready for loading at New Orleans. Treatment deduction shall be adjusted accordingly by mutual agreement.

## 6.    DURATION.

6.1    Period. The duration of this agreement shall commence on November 14, 2006 and shall continue thereafter until contractual commitments are met.

## 7.    TITLE AND RISK OF LOSS.

7.1    Title and Risk of Loss. Title to any Lot of Concentrate shipped hereunder shall pass to Buyer free and clear of all liens and encumbrances at the time Seller receives the Provisional Payment as contemplated by Clause 11.1, but subject to a security interest in favor of the Seller until Final Payment has been made by the Buyer. Such security interest shall not affect Buyer's right to blend, commingle, treat or process the Concentrate unless Buyer fails to pay when due. All risk of loss, damage, deterioration and contamination shall pass to Buyer upon Seller meeting its delivery obligations as per the terms in Section 5 above.

## 8.    CARGO INSURANCE.

8.1    Insurance Coverage. Cargo insurance shall be obtained by Seller for Buyer's benefit from the time of payment of the Concentrates by Buyer up to delivery as per Section 5 above. Thereafter, cargo insurance will be Buyer's responsibility. Seller and subsequently Buyer shall insure the Concentrates for such shipments at 110% of the provisional value as per customary terms for insured perils.

8.2    Insurance Proceeds. If Concentrate is lost or damaged prior to delivery to the Buyer as per Section 5 above, the price shall be determined as indicated in Sections 9-12 below. Upon the written request by Buyer, however, the Seller shall use its reasonable efforts to assist Buyer in the recovery of insurance from the insurers; provided that Seller shall not be obligated to enter into any settlement or incur any financial obligation in connection therewith and Buyer will reimburse Seller for any out-of-pocket costs or expenses reasonably incurred in connection therewith. All insurance claims shall be settled in accordance with the usual practice of cargo underwriters. After risk of loss has passed to the Buyer, Buyer shall look solely to the insurance proceeds for any loss (whether full loss or partial loss or damage) and the loss or damage shall not be deemed to be a default or failure of Seller to make any shipment or to meet any specification provided under this Contract and Buyer shall make final payment to Seller

Missouri Zinc Concentrates                                          Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.            BHL–P2119

(8.2 Insurance Proceeds continued).

based on provisional values for a total loss or calculated based on the undamaged portion for any partial loss or damage. If a shipment is lost or damaged prior to delivery to the buyer as per Section 5 above, then Seller shall replace the Lot as soon as practical.

9.      **PRICE.**

9.1      For each Lot of Concentrate, Buyer shall pay Seller the sum of the amount for the Payable Metals as provided in Section below, less the Treatment Deductions specified below:

9.1.1    Zinc. For zinc, Buyer shall pay Seller eighty-five percent (85%) of the full zinc content of each Lot, subject to a minimum deduction of eight (8) Units (the **"Payable Zinc"**). The price for such payable zinc shall be the average of the London Metal Exchange SHG Settlement quotation for the applicable Quotational Period, as published by Metal Bulletin.

9.1.2    Silver. For Silver, Buyer shall deduct three (3) troy ounces per metric ton and pay Seller for seventy percent (70%) of the balance (the **"Payable Silver"**). The price for such payable silver shall be the average of the London Spot US Equivalent quotation for the applicable Quotational Period, as published by Metal Bulletin.

9.1.3    Treatment Deduction. For the calendar year:

2007:    US$100.00 per DMT of the Concentrate based on an applicable Zinc price of US$3,000/MT.

2008:    US$115.00 per DMT of the Concentrate based on an applicable Zinc price of US$2,500MT.

9.1.4    Treatment Deduction Adjustment .

2007:    The Treatment Deduction shall be increased by US$0.10/DMT per each US$1.00/MT increase above a zinc price of US$3,000/MT and decreased by US$0.05/DMT per each US$1.00/MT decrease below a zinc price of US$3,000/MT.

2008:    The Treatment Deduction shall be increased by US$0.12/DMT per each US$1.00/MT increase above a zinc price of US$2,500/MT and decreased by US$0.05/DMT per each US$1.00/MT decrease below a zinc price of US$2,500/MT.

5

Missouri Zinc Concentrates                                    Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.      BHL–P2119

9.2    Alternate Pricing.  In the event that (i) the relevant Metal Bulletin ceases to be published, or ceases to publish any quotation referred to in this Contract for determining the prices for Payable Metals; (ii) the London Metal Exchange has ceased to quote a price for the applicable Payable Metals or the London Bullion Market Association has ceased to quote a price for the applicable Payable Metals composed of precious metals, as the case may be; or (iii) the daily quotations are, in the reasonable opinion of the Seller or Buyer, no longer representative of the then spot (most nearby) physical price for the applicable Payable Metals, then upon written notice by Seller or Buyer to the other, Seller and Buyer shall promptly consult with each other with the intent to determine a new basis consistent with the previous method for determining the prices for the Payable Metals so affected with respect to the Concentrate to be sold hereunder.

9.3    Quotations In US Dollars.  The prices of any Payable Metal if quoted in any currency other than US Dollars by the relevant publication or reference price, shall be converted into US Dollars using the average daily rate published by the Federal Reserve Board of the United States over the applicable Quotational Period for the purchase of US Dollars using the currency quoted in the applicable publication or reference price, as the case may be.

10.    **QUOTATIONAL PERIOD.**

10.1    Zinc.  At Buyer's option. The Quotational Period shall be declared for each shipment, either the calendar month of scheduled shipment (MOSH) or the second calendar month following the calendar month of arrival of the carrying vessel at the port of discharge (2MAMA).  At Seller's option for each shipment, a Quotational Period of the third calendar month following the calendar month of arrival of the carrying vessel at the port of discharge (3MAMA) shall be declared with an adjustment to the treatment deduction.

10.2    Silver.  The silver Quotational Period shall be the average of the calendar month after the month of arrival (MAMA).

10.3    The Quotational Period for zinc will be declared by Buyer prior to the beginning of the calendar month of scheduled shipment (MOSH). Seller has the right to price, by written notice to Buyer, ninety percent (90%) of the Payable Zinc content for the contractual tonnage after Seller delivers a shipping schedule as indicated in the Clause 5.1.  Such price shall be conformed to the declared Quotational Period. Such ninety percent (90%) provisional pricing will be made estimating a constructive arrival on the basis of the agreed shipping schedule.  Any cost or benefit arising from the change in respect of the final Quotational Period or final zinc content of any shipment or cancelled quota shall be for the account of Seller.

10.4    If for whatever reason (including an event of Force Majeure or default) Seller is unable or unwilling to ship to Buyer in accordance with the contract any amount of concentrates for which pricing has been agreed, then Buyer and Seller will close out the position on a mutually agreed date within three (3) Business days of Buyer's notice (to be presented to Seller only upon failure to ship) or notice of mutual agreement not to ship to this effect. Any resulting cost or benefit will be for the account of Seller.

Missouri Zinc Concentrates                                    Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.                    BHL–P2119

## 11.    PAYMENT.

For each Lot of Concentrate, the Buyer shall pay Seller as follows:

11.1    Provisional Payment.    The Buyer shall pay Seller a provisional payment equal to ninety percent (90%) of the total value (the **"Provisional Payment"**), as estimated by the Seller, against the presentation of a Warehouse Holding Certificate duly issued by Seller as per model attached in Appendix A. Buyer's representative has the right to inspect the Concentrate at Seller's warehouse prior to submitting the Provisional payment. At Seller's option, this Provisional Payment can be made against Barge Bill of Lading. In this latter case, payment will be made based on a minimum of one barge's weight.

11.1.1 Calculation of Provisional Payment.    For purposes of calculating the Provisional Payment, the payment amount set out in the Provisional Invoice shall be determined by the Seller based on (i) Seller's best estimate of weights, moisture content and provisional assays of the Concentrate as set out in Seller's provisional certificate for the weights, moisture content and assays (the **"Provisional Certificate"**) which shall be delivered to the Buyer with the Provisional Invoice; (ii) the Treatment and Penalty Deductions as then in effect as determined by the Seller under this Contract; and (iii) the provisional metal prices, which shall be determined by the Seller based on the average price for the payable metals as quoted in the same manner as used for determining the applicable payable metal price for final settlement, but averaged during the QP month or at a price agreed by the Parties hereto. On the basis of the foregoing, the Seller shall prepare and deliver to Buyer a Provisional Invoice (the **"Provisional Invoice"**) for such Concentrate in an amount calculated as aforesaid.

11.1.2 Following are the documents shall be presented by Seller to Buyer for the payments:

11.1.2.1    For payment against issuance of Holding Certificate:

(a) Seller's Holding Certificate transferring title of the Concentrate Lot covered thereby to Buyer as per format in Appendix A.

(b) Seller's provisional invoice.

(c) Provisional weight, moisture and assays provided by Seller.

(d) Insurance certificate covering damage and/or loss of the Concentrate while at storage site and while transported until delivery as per Section 5.

7

11.1.2.2    For payment upon barge loading:

(a)  Barge bill of ladings.

(b)  Seller's provisional invoice.

(c)  Provisional weights, moisture and assays for barge shipment provided by Seller.

(d)  Cargo Insurance certificate covering damage and/or loss of the concentrates shipped from mine until delivery as per Section 5.

11.2    Second Provisional Payment.    There will be a second provisional payment 45 days after Ocean Bill of Lading date, based on latest details, bringing the total provisional payment to 100%.

11.3    Final Payment.  The Buyer shall pay Seller a final payment equal to the balance of the total value of the Concentrate (the "Final Payment"), and which payment shall be made by the Buyer to the Seller as contemplated below.  For purposes of calculating the Final Payment, the Price shall be based on the final prices, dry weights, and final assays applicable to such Lot determined in accordance with Sections 9, 12, and 13 respectively.  Based on such calculations, the Seller shall prepare an invoice (the "Final Invoice") for the Lot in an amount equal to the Final Payment relating thereto as thus calculated.  Seller shall present its final invoice as soon as final weights, moisture, and assays are known.  The Final Payment shall be made by the owing party on the third (3rd) Business Day after presentation of the Final Invoice by the Seller.

11.4    Manner of Payment.  All payments for Concentrate sold to Buyer hereunder shall be made by the Buyer in US Dollars in immediately available funds by means of electronic wire transfer to Sellers account.  Such payments shall be made free of offsets, taxes and charges.  Bank charges, if any, levied by Buyer's bank or due to Buyer's fault in respect of payments hereunder shall be for the account of Buyer.  Bank charges, if any, levied by Seller's bank or due to Seller's fault in respect of payments hereunder shall be for the account of Seller.  Payment by the Buyer to the account designated by the Seller is a material term and of the essence of this Contract.  The payment obligations of Buyer under this Contract shall not be discharged by an amount paid in another place or to another account and shall only be discharged to the extent that payment is made in accordance with this Section.

11.5    Late Payment.  In the event that any payment to be made by Buyer or Seller under this Section is not made on the due date thereof, such outstanding payment amount shall bear interest at an annual rate equal to the three-month LIBOR rate in effect from time to time, plus two percent (2%) per annum, from and including such due date to, but excluding the date on which such payment is received, and calculated on the basis of a 365-day year.

11.6    Price Determination in the Event of Loss.

11.6.1  Total Loss.  In case of total loss or destruction of any Lot of Concentrate any time after risk of loss has passed to the Buyer and prior to weighing, sampling and moisture determination, the Final Invoice shall be based upon the Seller's full weights and assays as determined by Seller for the Provisional Payment.  In the event of a total loss during the voyage of the ocean vessel, the fortieth (40th) day after the bill of lading date shall be deemed the date of arrival of the carrying vessel to the port of discharge.  If the loss occurs before the ocean shipment, the forty-fifth (45th) day after completion of the first 5,000 DMT lot in Seller's facility shall be considered as the date of constructive Bill of Lading date.

11.6.2  Partial Loss.  In case of partial loss or damage to a portion of the Concentrate in any Lot after risk of loss has passed to the Buyer prior to weighing, sampling, and moisture determination, the Final Invoice for the lost or damaged portion shall be based upon the settlement for the undamaged portion with the weights to be based on Seller's full weights used for the First Provisional Invoice.

11.7    Taxes, Tariffs and Duties.  All taxes, fees, custom export duties and other governmental fees or charges (whether existing or imposed in the future), applicable to the Concentrate and/or Payable Metals sold hereunder or documents relating thereto imposed by the country of origin shall be borne by Seller. All taxes, fees, tariffs, custom import duties and other governmental fees or charges (whether existing or imposed in the future), applicable to the Concentrate and/or Payable Metals sold hereunder or documents relating thereto imposed by the any other country including in which the discharge port or receiving works is located, or any political subdivision thereof, shall be borne by Buyer. Each party shall be responsible for its own income taxes.

12.    **WEIGHING, SAMPLING, DETERMINATION OF MOISTURE.**

12.1    General Procedure.  Weighing, sampling, sample preparation and determination of moisture content for each Lot shall be carried out by Buyer in accordance with the procedures established by mutual agreement of the Parties, which must be in accordance with accepted international industry practices.  Seller, at its own expense, shall be entitled to be represented in person or by a representative at each of the discharge, weighing, sampling, determination of moisture and assaying conducted under this Section, but the failure to be present or have a representative present on any occasion after receipt of reasonable notice from Buyer shall constitute a waiver of Seller's right of representation for that action and on that occasion only.  These operations shall be made at the destination port or at the loading port, in Buyer's option.  However, should the wet weight determined at discharge port or at receiving smelter, as applicable, be lower than the Bill of Lading wet weight determined at loading port under the supervision of an internationally recognized supervision company less 0.2% (zero decimal two percent), then the wet weight determined at loading port under the supervision of an

(12.1 <u>General Procedure</u> continued).

internationally recognized supervision company less 0.2% (zero decimal two percent) will be the final wet weight for settlement purposes. Buyer will have the right to be represented at these operations at his own expense.

12.2    <u>Number and Handling of Samples.</u>  At least six representative samples shall be taken from each Lot of Concentrate.  From such samples, a thoroughly blended composite sample shall be prepared.  The composite sample for analysis of Payable Metals and Penalty elements shall be divided into six (6) equal homogenous parts, one (1) for Seller, two (2) for Buyer, two (2) for Umpire and one (1) for reserve.  All parts shall be marked with the contained weight, date and Lot number.  The Umpire parts will be sealed as soon as it is obtained and held by Buyer (or if requested by Seller, by Seller's representative) for possible Umpire use, and the Seller's parts will either be taken by the Seller's representative or mailed to Seller or its designated assay lab the following day.  All sample weights retained by Buyer for Umpire use (unless used by an Umpire) or reserve shall be included in the receiving shipment quantities and will be subject to the payment obligations to Seller.

12.3    <u>Lot Sizes.</u>  Subject to the express provisions of this Contract, the lot size shall be approximately 500 WMT or as otherwise agreed and the Buyer shall ensure that the samples obtained shall be properly representative of the Lot.  Each Lot shall form a separate and complete delivery for all purposes of this Contract.

13.    **ASSAYS.**

The Payable Metal content of each Lot of Concentrate shall be determined in accordance with this Section.  All analyses are based on a DMT basis.

13.1    <u>Method for Determining Final Analysis.</u>  From the sample parts taken in accordance with Section 12, assays for each Payable Metal contained in such Lot shall be made independently by each of the Seller and Buyer.  The results of such assays shall be exchanged simultaneously on a Lot-by-Lot basis by cross mail as soon as possible.  Determination for silver assays shall be made in accordance with corrected fire assay methods, corrected for slag loss and cupel absorption.  Umpires, when required, shall be instructed as to the agreed procedures accordingly.  If the exchanged results are within the following splitting limits, the mean of the assays for such metal as determined by the Buyer and the Seller shall control, absent proven error:

Silver: 15 grams/DMT of Concentrate
Zinc:   0.3%

Missouri Zinc Concentrates                                                Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.                           BHL–P2119

13.2    Designation of Umpire.  If the results of the assays described above show that the difference between Seller's and Buyer's assays exceeds the applicable splitting limit specified above, then absent agreement on the specific assay by the Seller and the Buyer within three (3) Business Days after the exchange of assays, either Party shall have the right, by notice to the other given within five (5) Business Days after the exchange of assays, to refer the determination for such Lot(s) to two of the Umpires listed below, in rotation, on a Lot by Lot basis.

(1) Alfred H. Knight                         (2) Alex Stewart
    Eccleston Grange, Prescot Road            Caddick Road
    St Helens, Merseyside WA10 3BQ            Knowsley Business Park
    United Kingdom                            Merseyside L34 9ER
                                              United Kingdom

The designation of any one of such Umpires for a Party's assayer or representative shall be deemed to disqualify such Umpire as an umpire. If neither Seller nor Buyer shall so refer the matter to Umpire within the applicable period, the mean of such results of the Buyer and the Seller for such element shall be final and binding upon the Parties hereto.

13.3    Final Analysis Based on Umpire's Assay.  If either Seller or Buyer shall so refer the matter to the Umpire, the Umpire's assay shall be made on the basis of one (1) Umpire sample chosen at random from the two (2) sealed Umpire samples referred to above, which sample shall be sent via air freight to the Umpire, together with the identification of the elements in dispute.  The Umpire shall be instructed to advise both Seller and Buyer of the results of the Umpire's assay by facsimile or by electronic means and by mail.  If the Umpire's assay falls between the assays of Seller and Buyer, the mean of the results of the Umpire's assay and the results of the assay of the Party whose results are nearer to that of the Umpire's results shall be final and binding on the Parties hereto.  If the results of the Umpire's assay shall be the mean of the results of the assays of the respective Parties, or equal to either of the assays of the respective Parties, the results of the Umpire's assay shall govern.  If the assay of the Umpire falls outside the assays of Seller or Buyer, the middle assay of the three assays shall be taken as the agreed assay.  The cost of the Umpire assay shall be paid by the Party whose assay is further from the Umpire assay.  When the Umpire assay is the exact mean of the other two, then these charges shall be shared equally by the Seller and Buyer.

## 14.    FORCE MAJEURE

14.1    Force Majeure.  Failure or delay by Seller or Buyer in the performance of any term, condition or covenant contained herein (other than a failure to make payments required hereunder), shall be excused, if such failure or delay in performance was caused by one or more events of force majeure (each an **"Event of Force Majeure"**); provided, however, that no Event of Force Majeure shall excuse any failure to make any payment hereunder when the same is otherwise due.

14.1.1 As used herein, an Event of Force Majeure shall mean any cause or condition beyond the reasonable control of the affected Party including, without limitation, any of the following: war, blockade, revolution, riot, insurrection, terrorism, civil commotion or civil disturbance whether deemed insurrection or not; strike, interference of unions, lockout, secondary boycott, other labor difficulties (whether legal or illegal and without regard to whether such difficulties can be resolved); act of God; fire, flood, storm or other inclement weather conditions; breakdown or destruction of plant or equipment; lack of trucks, containers, ships or facilities or delays in transportation; governmental or quasi governmental actions including without limitation expropriations, nationalizations, acts of eminent domain, export restrictions, embargo or confiscatory actions, taxes or regulations and/or revisions to the interpretations thereof; shortages of or inability to obtain fuel, power, water and/or raw materials; catastrophic failure at the Production Facility, mine, Receiving Works or other production facility; or any other cause whatsoever beyond the reasonable control of a Party which renders performance impossible or impracticable; provided, however, that in no event shall a lack of funds constitute a cause beyond the control of a Party.

14.1.2 Seller shall not be obligated to deliver Concentrate from any source other than the Production Facility and neither Seller nor Buyer shall be obligated to rebuild or repair any damaged or destroyed property in order to fulfill this Contract.

14.1.3 If Buyer is the Party affected by an Event of Force Majeure, Buyer shall nevertheless be obliged to receive, purchase and pay for any shipment of Concentrate which, at the time Seller received notice of the Event of Force Majeure was in the process of being loaded, or which had been loaded, into vessel contracted for delivery to the Buyer.

14.1.4 Notwithstanding any other provision hereof, no Event of Force Majeure shall have the effect of extending the term of this Contract.

14.1.5 The Party claiming an Event of Force Majeure shall give prompt notice thereof to the other Party indicating the nature of such Event, the date of effective commencement of such Event, and the estimated duration (if possible) of such Event. The Party claiming an Event of Force Majeure shall give further notice to the other Party (i) from time to time as to the progress in remedying such Event and as to the time that the affected Party expects to resume performance of its obligations hereunder and (ii) immediately after such Event ceases to have effect.

14.1.6 If an Event of Force Majeure declared by either Party pursuant to this Section 14 continues uninterrupted for more than one hundred eighty days (180) after the date of effective commencement of such Event indicated in the notice delivered by such Party, the other Party shall have the option, by notice to the declaring Party at any time prior to such Event of Force Majeure ceasing to have effect, to terminate this Contract, which termination shall be effective immediately after the delivery of such notice.

Missouri Zinc Concentrates                                      Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.                     BHL–P2119

## 15.    EVENT OF DEFAULT.

15.1    <u>Events of Default.</u>  The occurrence of any of the following events shall constitute an Event of Default with respect to a Party hereunder (whether such events shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

15.1.1  Failure to Pay.  The Party's failure to make any payment due hereunder on any due date thereof, which is not cured within two (2) Business Days after written notice of the same has been given by the non-defaulting Party;

15.1.2  Failure to Perform.  The Party's failure to observe or perform any of its other covenants and obligations hereunder and its failure to fully cure the same within fifteen (15) days after written notice of such default is given to such Party;

15.1.3  Breach of Representation.  Any representation of the Party made herein or in any document or certificate furnished to the other Party in connection herewith or pursuant hereto shall prove to be incorrect in any material respect;

15.1.4  Insolvency.  The Party shall (i) become insolvent; (ii) generally not pay its debts (trade or other) as they become due; (iii) file, or consent by answer or otherwise to the filing against it of, a petition of relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction; (iv) make an assignment for the benefit of its creditors; (v) consent to the appointment of a custodian, receiver, trustee or other officer with similar powers of itself or of any substantial part of its property; or (vi) take corporate action for the purpose of any of the foregoing; (vii) or if a court or governmental authority of competent jurisdiction shall enter an order appointing, without consent by the Party, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of the Party, or if any such petition shall be filed against the Party and such condition is not reversed or such petition shall not be dismissed within thirty (30) days; or (viii) any similar event in any jurisdiction in which the Party is in operation has occurred.

15.1.5  Reasonable  Assurances  of  Adequate  Performance.     Reasonable Assurances of Adequate Performance.  Upon a Party having grounds for insecurity of the ability of the other Party to timely and adequately perform, and demanding adequate assurances of adequate performance by such other Party, such other Party fails to provide such adequate assurances within five (5) business days thereof.

15.2    Costs and Fees.  If either Party incurs an Event of Default under this Contract, the defaulting Party agrees to pay the non-defaulting Party all reasonable attorneys' fees, costs, and expenses incurred by the non-defaulting Party in enforcing this Contract.


## 16.    REMEDIES FOR EVENT OF DEFAULT.

16.1    General Remedies.  In addition to, and without limitation of, any and all other rights of a Party at law or equity arising out of an Event of Default under any provision of this Contract, and without limiting any other suspension or termination rights of the non-defaulting Party under this Contract, for any Event of Default specified under Section 15, this Contract shall automatically terminate for any shipments not yet made.  In the case of any other Event of Default, the non-defaulting Party shall have the right to terminate this Contract for breach.  The termination or expiration of this Contract shall not terminate any obligation accrued prior to such termination or expiration, including, without limitation, any obligation to make any payment for any shipments already made, etc.  All remedies shall be cumulative.

16.2    LIABILITY    DISCLAIMER.    NOTWITHSTANDING    ANY    OTHER PROVISION OF THIS CONTRACT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY LOSS OF ANTICIPATED PROFITS OR OTHER CONSEQUENTIAL, SPECIAL OR INDIRECT LOSS OR DAMAGE OF ANY NATURE ARISING AT ANY TIME WHETHER ARISING UNDER CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR ANY OTHER CAUSE WHATSOEVER.


## 17.    MISCELLANEOUS.

17.1    No Waiver.  No course of performance and no delay or failure by any Party in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice its rights, powers or remedies.  No single exercise of any right or power shall preclude the further exercise thereof or the exercise of any other right or power hereunder.  No right, power or remedy conferred upon any Party by this Contract shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise, except as expressly provided herein.  No waiver of any provision of this Contract shall be effective unless made in writing signed by the Party against whom such waiver is sought to be enforced.

17.2    Waiver of Right of Setoff.  Buyer hereby agrees that its obligation to pay for all amounts due and to become due to Seller hereunder or in respect hereof shall not be subject to any counterclaim, set-off, deduction or defense against Seller other than such counterclaims, set-offs, deductions or defenses arising under or in respect of this Contract.

Missouri Zinc Concentrates                                    Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.              BHL–P2119

17.3    Assignment. Except as otherwise permitted in this Section 17, neither Party may grant, assign or transfer any of its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld, and any attempt to assign or transfer, or to effect an assignment or transfer without such consent shall render such attempted assignment or transfer void. Any such assignment with consent shall not relieve the assignor from its obligations under this Contract to the extent the assignee fails to perform such obligations.

17.3.1 Buyer acknowledges and agrees that Seller may assign its rights and obligations under this Contract to its senior lenders as security for any debt obligations owing by Seller to such senior lenders from time to time, provided, that except as provided in this Section 17, no such assignment shall have the effect of increasing the obligations of Buyer or affecting the rights of Buyer pursuant to this Contract or giving any assignee any rights or claims against Buyer which would be more favorable than Seller would have had against Buyer had the corresponding assignment not taken place; nor shall such assignment and transfer excuse or otherwise discharge Seller from its own obligations under this Contract. Buyer hereby irrevocably consents to such assignment.

17.4    Amendments. Any amendment to this Contract shall only be effective if in writing and executed by or on behalf of both Parties.

17.5    Governing Law. THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA, EXCLUDING ANY CONFLICTS OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION. EACH PARTY HEREBY CONSENTS TO SUCH JURISDICTION FOR ALL PURPOSES OF THIS CONTRACT. THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS SHALL NOT APPLY TO THIS CONTRACT.

17.6    Severability. If any provision of this Contract shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

17.7    Confidentiality. Each Party shall use reasonable commercial efforts to assure that the provisions of this Contract and all information disclosed to it concerning the other Party and its assets and businesses and not otherwise publicly available and the determination of any matter hereunder by any Umpire, Referee or arbitrator shall be kept confidential. Provided, however, the foregoing obligations of confidentiality shall not be deemed to prohibit any of the following disclosures under obligations of confidentiality as would normally be used by a party for its own information:

17.7.1 To the directors, officers, employees, accountants, consultants, counsel and representatives of each Party;

17.7.2 To any proposed assignee;

15

17.7.3  To the Seller's senior lenders or to any other person or entity providing substantial financing to the Seller or Buyer;

17.7.4  To the shareholders of the Seller or Buyer or as required by securities laws or stock exchange rules;

17.7.5  To any underwriter of securities to be issued by the Buyer or Seller, or a rating agency;

17.7.6  In connection with legal proceedings or required filings with government agencies, courts, stock exchanges or other regulatory agencies;

17.7.7  To any Umpire, Referee or arbitrator appointed hereunder; or

17.7.8  To such other person as reasonably required for the normal conduct of business. Nothing herein shall be deemed to prohibit or restrict a Party's disclosure of its own information.

17.8    Notices.  All notices, requests, directions and other communications required or permitted by any provision of this Contract shall be in writing and shall be sufficiently given or transmitted if delivered in person, by express service guaranteeing overnight delivery, or sent by facsimile with a hard copy sent by regular mail, and in each case addressed to the party as follows, or such other address as the Party may designate in writing by Notice so given from time to time.

| | |
|---|---|
| If to Seller: | The Doe Run Company |
| | 1801 Park 270 Drive   Suite 300 |
| | St. Louis, MO 63146 |
| | Attn:  Vice President Sales and Marketing |
| | Tel:  314-453-7111 |
| | Fax:  314-453-7180 |

| | |
|---|---|
| If to Buyer: | BHL Resources Limited Inc. |
| | Edificio The Century Tower Piso 16 |
| | Oficino 1621, Via Ricardo J. Alfaro |
| | Apartado 87 –4094, zona 7 Panama |
| | Tel:  + (00507) 260 3901 |
| | Fax:  + (00507) 260 8911 |

| | |
|---|---|
| Copy to: | BHL |
| | Calle Teruel 370 |
| | Miraflores |
| | Lima 18 - Peru |
| | Attn: Hector de los Rios / Francisco Fernandez |
| | Tel:  +51-1-617-1100 |
| | Fax:  +51-1-422-5131 |

Missouri Zinc Concentrates                                      Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.                    BHL–P2119

17.9    Further Assurances.  Each of the Parties shall execute and deliver all such other and additional documents and perform all such acts, in addition to execution and delivery of this Contract and performance of the Party's obligations hereunder, as are reasonably required from time to time in order to carry out the purposes, matters and transactions that are contemplated in this Contract.

17.10    Incorporation of Appendices.  All appendices and attachments attached to, or referenced in, this Contract are by this reference incorporated herein as if fully set forth in the main body of the Contract.

17.11    Resolution of Disputes.  Any dispute, controversy or claim arising out of or relating to this Contract or the breach, termination, or invalidity thereof other than disputes to be resolved exclusively by Umpire determination pursuant to Clause 13.3 (all such other disputes, controversies or claims are hereinafter referred to as a "dispute") shall be resolved solely as follows:

17.11.1.  The Parties shall endeavor for a period of fifteen (15) days to resolve the dispute by negotiation.  In the event the dispute is not successfully resolved within such period by mutual agreement, if the amount in dispute is $500,000 or less, the Parties agree to submit the dispute to binding arbitration in accordance with the rules then prevailing of the American Arbitration Association.  If the amount in dispute exceeds $500,000, then the resolution of the dispute will be made by a New York Court.

17.11.2  Unless otherwise agreed by the Parties, there shall be one arbitrator who shall be a person with a technical expertise or background in the subject area of the dispute and who shall be fluent in English.

17.11.3  If the Parties are unable to select an arbitrator within thirty (30) days of the notice of arbitration, the arbitrator shall be selected, and the arbitration administered, by the American Arbitration Association, New York, New York, U.S.A.

17.11.4  Unless otherwise agreed by the Parties, the place of arbitration shall be New York, New York.

17.11.5  Unless otherwise agreed by the Parties, the language used in the Arbitration shall be English.

17.11.6  The arbitrator shall have the authority to order the Parties to produce documents or items for inspection and to provide appropriate discovery to each other, including the depositions of Party witnesses.

17.11.7  The arbitrator shall have the authority to order interim measures or preliminary injunctive measures and to require an undertaking or bond if appropriate.

17.11.8  At the request of any Party, there shall be an oral hearing for the presentation of oral testimony and oral argument.  Written presentations may also be received.  The Parties shall have the right to cross examine witnesses, if requested.

Missouri Zinc Concentrates                                    Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.                      BHL–P2119

17.11.9  The arbitrator shall have the authority to administer oaths and to issue orders requiring the presence of witnesses at the hearing if consistent with local law, or to apply to a local court to issue such orders.

17.11.10  The arbitrator shall decide the matter on the basis of fairness and equity and in accordance with the provisions of this Contract.

17.11.11  The arbitrator shall render a decision in writing not more than six (6) months after the notice of arbitration given under the AAA Arbitration Rules.  The decisions shall be final and binding on the Parties and not subject to appeal or review.

17.11.12  The prevailing Party shall be entitled to an award of costs and attorneys' fees unless the arbitrator determines that each Party should bear its own costs and split the common costs of arbitration.

17.12  <u>Execution in Counterparts.</u>  This Contract may be executed in any number of counterparts and by the Parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

17.13  <u>Consent to Jurisdiction.</u>  Each Party hereto hereby irrevocably consents and agrees, for the benefit of each other Party, that any legal action, suit or proceeding against it (i) with respect to enforcement of the provisions, shall be brought in any federal or state court located in the Borough of Manhattan, The City of New York (a *"New York Court"*) and irrevocably accepts and submits to the exclusive jurisdiction of such New York Court with respect to any such action, suit or proceeding; and (ii) with respect to the enforcement, modification, vacation or correction of an award rendered in an arbitration may be brought in any New York Court and hereby irrevocably accepts and submits to the non-exclusive jurisdiction of such New York Court with respect to any such action, suit or proceeding. Each Party waives any objection which it may have now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings specified in Sections (i) and (ii) above brought in any New York Court and hereby further waives and agrees not to plead or claim in any such New York Court that any such action, suit or proceeding therein has been brought in an inconvenient forum.

17.14  <u>Headings.</u>  The headings of the respective Sections and Clauses of this Contract are inserted for convenience of reference only and shall not be deemed to be a part of this Contract or considered in construing this Contract.

Missouri Zinc Concentrates                                    Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.              BHL–P2119

18.    **ENTIRE CONTRACT.**

**THIS CONTRACT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO, WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND SUPERSEDES ANY AND ALL PRIOR AGREEMENTS, UNDERSTANDINGS, AND COMMUNICATIONS, WHETHER ORAL OR WRITTEN, BETWEEN THE PARTIES HERETO AND PERTAINING TO THE SUBJECT MATTER OF THIS CONTRACT. NO CHANGES, ALTERATIONS OR MODIFICATIONS OF THIS CONTRACT SHALL BE EFFECTIVE, UNLESS THE SAME ARE IN WRITING AND SIGNED BY THE PARTIES.  NO PROVISION IN ANY STANDARD PURCHASE ORDER OR SIMILAR FORM OF EITHER PARTY SHALL CONTROL OR OTHERWISE MODIFY THIS CONTRACT.  THESE TERMS ARE EXCLUSIVE.**

IN WITNESS WHEREOF, the Parties have caused this Contract to be signed and delivered by their duly authorized officers to be effective as of the Effective Date hereof.

**The Doe Run Resources Corporation**          **BHL Resources Limited Inc.**

DATE: _____          DATE: _2-05 2007_
By: _____          By: _____
Print Name: _____          Print Name: _Luis Antonio Lopez_
Print Title: _____          Print Title: _____

BHL Resources Ltd. Inc.
LUIS A. LOPEZ
Secretario

Missouri Zinc Concentrates                                    Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.      BHL-P2119

## APPENDIX A

****** TO BE ISSUED ON HEADED PAPER OF THE DEPOSIT KEEPER ******
### NON-NEGOTIABLE HOLDING CERTIFICATE

**DATE:**
**TO:    BHL Resources Limited Inc.**
**CONTRACT NO.:**   DR-ZNC-114307/BHL-P2119

The Doe Run Resources Corporation, ("**Doe Run**") hereby certifies to **BHL Resources Limited Inc.**, as Buyer, that an estimated quantity of _____ metric tons of zinc concentrates ("**the Goods**"), produced by Doe Run, are at present stockpiled at Doe Run's storage area at Doe Run's _____ facility, located at _____, and are held at the disposal of FULL NAME AND ADDRESS OF BANK ("**the Bank**") for and on behalf of your account pursuant to the Contract, and for which you have paid a provisional payment towards the purchase price. Doe Run furthermore confirms that the Goods are held in storage, segregated from all other materials, free and clear of any lien or encumbrances arising from Doe Run, except a **first priority security interest** in the Goods in favor of Doe Run for payment in full for the same. Upon your instructions, to be confirmed by the Bank, and return to Doe Run of this Holding Certificate, or assurances that the Holding Certificate will be returned in due course (unless there has been a material adverse deterioration of your credit), the Goods will be released to you or the Bank in accordance with the Contract. Title to the Goods is hereby transferred to you, subject to a first position security interest reserved in our favor to secure payment for the Goods.

Doe Run shall take reasonable commercial steps to safeguard the Goods; provided your personnel or persons authorized in writing by you, at any time prior to the shipment of the Goods from Doe Run, shall have access to the material during ordinary business hours at such storage facility to inspect the same. The Goods shall be kept at all times at the foregoing facility, and they shall be clearly marked in the name of the Bank for and on behalf of your account. Doe Run hereby confirms to be fully responsible for the Goods stored at Doe Run's facility and covered by this Holding Certificate, until shipment as per the Contract. Provided, however, that the Goods shall be fully removed from Doe Run's location on or before _____, 20__, or reasonable storage charges shall apply.

This Holding Certificate is issued as an accommodation to you for the Goods listed herein and none other. This Certificate is not negotiable, transferable or assignable in whole or in part. Any such negotiation, transfer or assignment, or attempt thereof, shall be void. The original of this Holding Certificate must be surrendered in exchange for the completed transfer or Bills of Lading issued in respect of the Goods, or unless there has been a serious deterioration of your credit, upon your assurances that this Holding Certificate will be returned in due course, but in which case you shall be responsible for any loss of this Holding Certificate or any transfer of the same except to Doe Run. In any event, this Holding Certificate shall expire fifteen (15) calendar days from the date of the release of the Goods in whole covered hereby to you or your designated recipient. This Holding Certificate shall be governed by and construed and enforced under the laws of the State of New York.

This Holding Certificate is subject to the terms and conditions of the above referenced Contract in effect with you. Approved by:

The Doe Run Resources Corporation
Signed: _____
Title: _____
Date: _____

20

Missouri Zinc Concentrates                                   Contract No. DR-ZNC-11407
Doe Run Resources Corporation/BHL Resources Limited Inc.                 BHL–P2119

## APPENDIX B

**BAILMENT.** Pursuant to Section 11 (Payment) relating, Seller agrees to accept, store and hold Buyer's zinc concentrates in bailment for Buyer in strict conformity with the terms of this contract, at no cost to Buyer. Seller agrees to exercise its best efforts to take care of and preserve the zinc concentrates.

**TITLE.** Buyer will retain ownership of and title to its zinc concentrates at all times.

**SEGREGATION OF ZINC CONCENTRATES.** Immediately upon sale of the zinc concentrates to Buyer at Seller's plant, Seller shall transfer the zinc concentrates to a clearly defined and assigned area within the plant (the "Perimeter Area") where they will be segregated and stored separately from any and all other zinc concentrates to which Seller has title, in which Seller holds any interest or to which Seller holds custody (whether by a bailment or consignment agreement or otherwise) that is physically present at any of Seller's plants ("Other Zinc Concentrates Inventory"). Upon such transfer, Seller shall ensure that Buyer's zinc concentrates remain segregated from any Other Zinc Concentrates Inventory. Seller covenants and represents that it will not remove Buyer's zinc concentrates from the Perimeter Area to any other location for any reason until Buyer authorizes release of the material in writing and the zinc concentrates have been released from the Holding Certificate. Seller shall post clearly visible signs and notices, identifying the zinc concentrates as property of Buyer or its designated financing bank. Seller shall not remove any markings or indicia of ownership that Buyer may place on the zinc concentrates. In no event shall free storage exceed sixty (60) days after sale. Any inventory and/or personal property or ad valorem taxes assessed on the stored zinc concentrates shall be the responsibility of the party having title to the same.

**DISPOSITION OF AND ACCESS TO ZINC CONCENTRATES.** Seller will hold the zinc concentrates at the direction, and for the exclusive benefit, of Buyer (and its successors and assigns, including any secured lender of Buyer). Seller will not dispose of, move from the premises or release any of the zinc concentrates except upon Buyer's bank's written instructions. Seller will allow Buyer access to the zinc concentrates at the plant upon reasonable prior notice.

**INSURANCE.** During the period of storage, Seller shall at its own expense insure the zinc concentrates against all risks in an amount sufficient to cover the market value or potential full replacement cost of the zinc concentrates, for the benefit of and in Buyer's name as an additional insured and loss payee.

**INDEMNIFICATION.** To the fullest extent permitted by applicable law, Seller shall, with respect to the bailment of zinc concentrates for Buyer, defend, indemnify and hold harmless Buyer, its affiliates, and their directors, officers, shareholders, employees, representatives, agents, representatives and contractors, for and against any Liabilities, including those related to injury, disease, or death of any person or damage to or loss of any property that directly or indirectly arise out of (i) any adverse claims, liens, security interests or other encumbrances that are asserted by any Person with respect to the zinc concentrates, (ii) any loss of or damage to the zinc concentrates, including loss or damage resulting from a force majeure event or (iii) the loss of Buyer's ownership interest in the zinc concentrates for any reason. As used herein, (a) "Liabilities" means any losses, claims, charges, damages, deficiencies, assessments, interests, fines, penalties, costs and expenses of any kind (including reasonable attorneys' fees and other fees, court costs and other disbursements), whether arising out of or related to any suit, proceeding, judgment, settlement or judicial or administrative order, or otherwise arising, suffered or incurred, and (b) "Person" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization, joint stock company or any other private entity or organization, governmental authority or agency, court or any other legal entity, whether acting in an individual, fiduciary (including as trustee in bankruptcy) or other capacity.

**UCC MATTERS.** Seller hereby authorizes Buyer to file, without Seller's signature, in any filing office in any UCC jurisdiction, any initial financing statements and amendments thereto that indicate Buyer's ownership interest in the zinc concentrates, in the form agreed as set forth as an attachment to this contract.

Once Seller delivers the full quantity of material as per Section 5 (Delivery) and pursuant to Section 11 (Payment) Buyer shall return original Holding Certificates to Seller and shall mark "cancelled".